UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

Y.W.,

        Plaintiff,

v.

KIMBERLY ROBERTS, VERONICA ZERON, PATRICIA AUFIERO, UNKNOWN TEACHER, and NEW MILFORD BOARD OF EDUCATION,

        Defendant.

Civ. No. 2:14-01642

OPINION

**WILLIAM J. MARTINI, U.S.D.J.:**

    Plaintiff Y.W., a resident of New Milford, New Jersey, brings this action against two employees of the New Jersey Division of Child Protection and Permanency ("DCPP"), Defendants Kimberly Roberts and Veronica Zeron, alleging violations of his substantive and procedural due process rights under the 14th Amendment, in connection with the DCPP's investigation of him for child abuse. This matter comes before the Court on the parties' competing motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons set forth below, Plaintiff's motion is **DENIED**. Defendants' motion is **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND

    The Court assumes the parties' familiarity with the facts and procedural history of the instant case and writes solely for their benefit. Unless otherwise noted, the following facts are undisputed.

### A.    The Undisputed Facts

#### 1.    *The Events of February 1, 2013*

    On February 1, 2013, DCPP received an anonymous call from an individual at the Berkley Street School in New Milford, New Jersey. The caller reported the following details about Plaintiff's son, Y.Y., who was a student at the school.

1

- In response to seeing a picture of an American Indian with children sitting in his lap, Y.Y. spontaneously stated that the children were "touching their dad," that he too touches his dad, that touching him is "a secret," and that he gets "a special surprise" from doing it. Pl.'s Statement of Uncontested Facts ("Pl.'s Stmt."), Ex. CC ("Tr.") 3:20–25, ECF No. 109-31.
- Y.Y. was a student with autism. Tr. 5:10.
- Y.Y. had been complaining of an "itchy" bottom that week. Tr. 5:3–5.
- In the past, staff redirected Y.Y. when he "humped things." Tr. 8:24–9:7.
- Y.Y. told school staff that he lives in a one-bedroom apartment and shares a room with his mom, his dad, and his mom's boyfriend. Tr. 6:22–23.

The DCPP employee who received the call created a "screening summary," summarizing the content of the call, identifying Plaintiff as the alleged perpetrator and coding the report "CPS IMMEDIATE for Sexual Molestation." Pl.'s Stmt., Ex. B 1–2, ECF No. 109-4.

Upon receiving the screening summary, Defendant Roberts, then a DCPP intake investigator, traveled to the Berkley Street School with a New Milford police officer. Pl.'s Stmt., Ex. D ("Roberts Dep.") 10:16–19, ECF No. 109-6; *id.*, Ex. F ("Invest. Summ.") 3, ECF No. 109-8. There, Roberts interviewed the school principal, Pat Aufiero, and Y.Y.'s teacher, Kelly Mayer. Aufiero told Roberts that Y.Y.'s teacher came to her and reported the statement he made about his father. She also said that Y.Y. was classified as autistic, that he had a good attendance record, came to school clean and appeared to be healthy. Aufiero stated that there had never been a concern about Y.Y. in the past and that his mother was always in contact with the school when conferences or issues arose. She further indicated that Y.Y. lives with Plaintiff, Y.Y.'s mother ("Mother") and her boyfriend ("Boyfriend").[1] *See* Invest. Summ. at 3.

Roberts next spoke with Mayer, who corroborated the events described on the anonymous call, including Y.Y.'s statements about touching his father and history of humping objects. Mayer also stated that she never had concerns about abuse or neglect with Y.Y. prior to that day.[2] *Id.*

Roberts then interviewed Y.Y., who confirmed that he lives in a one-bedroom apartment with Plaintiff, Mother and Boyfriend, but also added that he sleeps in his own bed. He said that everyone sleeps with clothes on and he has never seen any of the adults naked. He said that his parents reward him with special prizes for good behavior, such as being a good listener. He was able to identify various parts of his body, but when Roberts

---

[1] At her deposition, Aufiero did not recall the specifics of her conversation with Roberts, but she confirmed that a DCPP worker came to the school in response to an anonymous report concerning Y.Y. She further confirmed that Mayer came to her concerned about Y.Y.'s statements and she identified Mayer's voice as the anonymous caller. *See* Pl.'s Stmt., Ex. T ("Aufiero Dep.") 25:19–22, 44:14–17, 46:17–22, 117:23–25, 173:12–13, ECF No. 109-22.

[2] At her deposition, Mayer recalled going to Aufiero with a concern about Y.Y. but she could not recall the specifics of her concern or the substance of her conversations with Aufiero or Roberts. *See* Pl.'s Stmt., Ex. Q ("Mayer Dep.") 67:8–69:3, 169:5–8, 178:15–17, 179:16–24, 223:17–22, ECF No. 109-19.

pointed to his penis, Y.Y. called it "pants" and "underwear." Roberts asked if Y.Y. knew what his private area was, to which he responded no. Upon further explanation, Y.Y. responded that Mother and Plaintiff had explained what his private area was before but that he had forgotten. Y.Y. also denied ever being touched in his private area by Plaintiff, Mother, Boyfriend or anyone else. He further explained that Mother and Plaintiff touch him on his back and give him hugs and kisses. He denied that anyone ever touched his bottom area and reported that he occasionally has trouble cleaning himself after going to the bathroom. He also denied stating to anyone that Plaintiff, Mother or Boyfriend keeps secrets. He further denied that Plaintiff gives him special gifts. *See id.* at 3–4.

Later that day, Roberts traveled to Y.Y.'s residence to interview his parents.[3] Plaintiff was home with Y.Y. when Roberts arrived. Plaintiff explained that he lived there with Mother and Boyfriend, but that he also often stayed with his family in Brooklyn. Plaintiff confirmed that Y.Y. had autism, specifically Asperger's Syndrome, and that he and Mother rewarded Y.Y. for good behavior, which they referred to as a special gift. Plaintiff denied giving Y.Y. special gifts in exchange for keeping secrets and further denied ever sleeping in the same bed with him. A few weeks prior, Plaintiff and Mother explained to Y.Y. what private areas were and the importance of not exposing himself after an incident where Y.Y. emerged from the bathroom with his pants pulled down. Plaintiff said that it was sometimes difficult to explain things to Y.Y. because he often repeats what is said to him multiple times. *See id.* at 4.

Roberts observed the bedroom and noted that it had a twin bed where Plaintiff slept, a toddler bed for Y.Y. and a queen-sized bed for Mother and Boyfriend. Plaintiff advised that Y.Y. bathes himself under Mother's supervision and confirmed that he has trouble cleaning himself after going to the bathroom. Plaintiff stated that he never saw Y.Y. humping objects or otherwise acting out in a sexual manner. Plaintiff denied any inappropriate touching between Y.Y. and himself. *See id.* at 5.

Roberts subsequently left the apartment and called her supervisor, Defendant Zeron. Roberts conveyed to Zeron her findings to that point. Zeron instructed Roberts to implement a Safety Protection Plan (the "Safety Plan"), which would restrain all unsupervised contact between Y.Y., Plaintiff and Boyfriend. Under the Safety Plan, Mother would provide all necessary supervision. *See id.*

Roberts waited outside of the apartment until Mother and Boyfriend returned home later that night, at which time Roberts approached and explained the situation. Mother was shocked to learn of the events and stated that she never saw any signs that Y.Y. had been molested. She further corroborated much of what Plaintiff previously said, including their

---

[3] The police officer did not accompany Roberts to the residence because Y.Y. did not disclose that he had been sexually abused during his interview. At that time, Bergen County policy provided that the County Prosecutor's Office would take control of an investigation as a criminal matter if an individual disclosed that she or he was a victim of a crime, such as sexual abuse. Absent such a disclosure, DCPP remained responsible for completing the investigation. *See* Roberts Dep. 61:20–67:23.

3

sleeping arrangements, Y.Y.'s trouble with cleaning himself, giving Y.Y. special gifts for good behavior and explaining to him the importance of not exposing himself. She also said that she never saw Plaintiff acting strange around Y.Y. *See id*. at 5–6. Roberts then interviewed Boyfriend, who largely corroborated what Plaintiff and Mother previously stated. *See id*. 6–7.

Upon completing the interviews, Roberts brought the adults together and explained the Safety Plan that was being implemented, specifically that any contact with Y.Y. must be supervised by Mother. Roberts stated that there were ongoing concerns due to Y.Y.'s inability to name his private parts and that DCPP would refer him to Audrey Hepburn Children's House ("AHCH") for a forensic psychosocial and medical examination. Upon the conclusion of the examination, the Safety Plan would be lifted depending on the outcome. All parties agreed to comply with the Safety Plan, although questions remain as to what exactly was said during this meeting and whether Plaintiff was coerced into complying. *See id*. at 7; Ex. I.[4]

### 2. *Subsequent Events*

On February 5, 2013, Roberts conferenced Y.Y.'s case with her casework supervisor, Susan Lennon, who instructed that the Safety Plan be revised to remove Boyfriend from the supervision restraint because Y.Y. did not disclose any concerns about him.[5] *See* Invest. Summ. at 7; Roberts Dep. 183:15–21. Roberts then traveled to Y.Y.'s apartment to deliver the revised Safety Plan. Roberts informed Mother and Boyfriend of the revision and that Boyfriend's contact with Y.Y. would no longer need to be supervised. They indicated that they would continue to comply.[6] *See* Invest. Summ. at 7–8.

Y.Y.'s forensic evaluation was originally scheduled to occur at 9:30 a.m. on February 28, 2013, which was AHCH's first available date upon DCPP's referral. Pl.'s Stmt., Ex G ("Roberts Dep.") 343:10–345:5, ECF No. 109-9; *id*., Ex. P 2, ECF No. 109-18. On or before February 23, 2013, Plaintiff retained counsel to represent him in the investigation. *See* Ex. P at 1. On February 26, Plaintiff's counsel wrote to DCPP, requesting that the February 28th appointment be canceled and rescheduled for March 4th. *See id*. at 2. Y.Y.'s forensic psychosocial evaluation was eventually rescheduled for March 14th. On that same date, Roberts received a call from AHCH confirming that Y.Y. had been evaluated and that there were no indicators of sexual abuse. *See* Invest. Summ. at 8.

---

[4] At his deposition, Plaintiff corroborated the events of Roberts' visit as described in the investigation summary while maintaining his dispute over the specifics of the exchange between him and Roberts. *See* Pl.'s Stmt., Ex. H ("Pl.'s Dep.") 81:22–100:12, 106:12–117:17, ECF No. 109-10.

[5] For her part, Lennon does not recall meeting with Roberts or Zeron about the instant case. Nevertheless, Lennon testified that she felt sure that she at least spoke with Zeron given their work history. She further testified that she would have implemented the same Safety Plan when confronted with the facts of this case. *See* Pl.'s Stmt., Ex. V ("Lennon Dep.") 90:17–95:18, ECF No. 109-24.

[6] As with the events of February 1, there remain differing accounts as to what exactly Roberts and Mother said during this meeting. It is undisputed, however, that Roberts met with Mother and provided the revised Safety Plan. *See* Pl.'s Dep. 94:7–22.

On March 15, 2013, Roberts called Mother and informed her of the results of the AHCH evaluation. She stated that the Safety Plan would be suspended as of that day, but that DCPP still needed to conduct a closing visit at the apartment. Roberts also called Plaintiff and informed him of the same. *See id*. at 8–9. Roberts followed up her conversations by sending Mother an email, confirming that Plaintiff no longer needed to be supervised. *See* Pl.'s Stmt., Ex. L, ECF No. 109-14. On March 20, 2013, Roberts met with Plaintiff, Mother, Boyfriend and Y.Y. in their apartment, and conducted the closing visit, effectively terminating the case. *See* Pl.'s Counterstatement to Defs.' Proposed Statement of Material Facts ("Pl.'s Stmt."), Ex. LL, ECF No. 115-7.

### B. The Parties' Competing Summary Judgment Motions

Plaintiff now moves for summary judgment, arguing first that Defendants violated his substantive due process rights because of "the total absence of articulable evidence to support a belief that sexual abuse had occurred" when they implemented the Safety Plan. *See* Pl.'s Br. in Supp. of Summ. J. ("Pl.'s Br.") 29, ECF No. 108-1. Plaintiff submits that the facts here are closely analogous to the facts from *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123 (3d Cir. 1997), where the Third Circuit determined that limited corroborating evidence did not provide adequate indicia of sexual abuse to warrant interference with familial integrity. *See id*. at 28–29. Defendants, therefore, lacked objectively reasonable evidence of abuse under Third Circuit precedent and their actions violated Plaintiff's substantive due process rights. *Id*.

Plaintiff also argues that Defendants violated his procedural due process rights by failing to notify him of his right to a post-deprivation hearing within ten days of the Safety Plan's implementation and by failing to provide him with the DCPP's Parents' Handbook at the time of implementation. *See id*. at 32. Finally, Plaintiff moves for an adverse inference against Defendants for failing to maintain their handwritten notes made contemporaneously with the events at issue. *See id*. at 33–36. Plaintiff asks this Court to conclude that any valid basis for implementing the Safety Plan would have been recorded in DCPP's electronic system and that Defendants, therefore, had no corroborating evidence for the implementation of the Plan. *See id*. at 36.

Defendants separately move for summary judgment against Plaintiff, arguing first that they did not violate Plaintiff's substantive due process rights because their implementation of the Safety Plan through the completion Y.Y.'s forensic evaluation cannot possibly be considered as conduct that "shocks the conscience." *See* Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.") 22–27, ECF No. 111-4. Defendants also argue that they did not violate Plaintiff's procedural due process rights because Plaintiff consented to the implementation of the Safety Plan and never once raised an objection to it thereafter, even after he retained counsel, thereby foregoing the requirement to hold a post-deprivation hearing. *See id*. at 28–33. Finally, Defendants argue that they are entitled to qualified immunity because their conduct did not violate a clearly established constitutional right. Specifically, Defendants submit that the facts here are distinguishable

5

from *Croft* because the Safety Plan did not remove Plaintiff or Y.Y. from the home and only restricted Plaintiff from unsupervised contact with Y.Y., not all contact. *See id.* at 33–41. Plaintiff further submits that the Third Circuit's more recent holding in *Mammaro v. N.J. Div. of Child Protection & Permanency*, 814 F.3d 164 (3d Cir. 2016), clarifies that *Croft* is not sufficient to establish a "robust consensus of persuasive authority" in determining whether Defendants' conduct violated Plaintiff's due process rights. *See id.* at 40–41.

Plaintiff opposed Defendants' motion, arguing that Defendants' mischaracterize the *Mammaro* decision and that they failed to produce any evidence that distinguishes the instant case from the facts in *Croft*. *See* Pl.'s Br. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n") 24–29, ECF No. 114. Plaintiff further argues that Roberts coerced Plaintiff into consenting to the Safety Plan and Defendants, therefore, cannot show that Plaintiff's waiver of his procedural due process rights was voluntary, knowing and intelligent. *See id.* at 31–33. Plaintiff also submits that Defendants failed to raise certain affirmative defenses. *See id.* at 30–31, 33. Plaintiff finally argues that the requirement of some corroborating evidence of abuse before interfering with familial integrity was clearly established at the time of Defendants' actions. *See id.* at 34. Defendants did not file a separate opposition to Plaintiff's motion; however, the Court finds that the parties' cross-motions present diametrically opposed positions.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007).

"The standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Appelmans v. City of Philadelpia*, 826 F.2d 214, 216 (3d Cir. 1987). "Such motions: 'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Transportes Ferreos de Venez. II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co.*

*v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

### III. DISCUSSION

The Court first addresses Plaintiff's motion for an adverse inference against Defendants before turning to the merits of the due process claims.

#### A. Adverse Inference for Spoliation of Evidence

Plaintiff moves for an adverse inference against Defendants for their failure to preserve handwritten notes made contemporaneously with the interviews, conferences and other events as they unfolded in this case. *See* Pl.'s Br. at 33–36. "When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995). "Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) (citing *Brewer*, 72 F.3d at 334). "No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." *Brewer*, 72 F.3d at 334 (citation omitted).

Roberts and Zeron admitted that they destroyed their contemporaneous notes and there is little doubt that those notes would have been relevant to the issues in this case. *See* Pl.'s Stmt., Ex. C ("Zeron Dep.") 23:21–24:12, ECF No. 109-5; Roberts Dep. 191:14–192:15. There is no evidence, however, that Roberts or Zeron intentionally destroyed their notes to prevent their production during litigation. Roberts stated that she generally shredded her notes to protect the confidential information contained therein at the conclusion of each case. *See* Roberts Dep. 191:18–19, 194:13–195:5. Zeron testified that she did not retain her notes because she inputted all her case notes to that same electronic system. *See* Zeron Dep. 23:21–24:12. For her part, Lennon stated that she also shredded her case notes when she served in the same roles as Roberts and Zeron. *See* Lennon Dep. 40:10–42:16. Consequently, the Court finds that neither Roberts nor Zeron destroyed their case notes with the intent to avoid their production in pending or prospective litigation. Accordingly, an adverse inference is unwarranted and Plaintiff's motion is **DENIED**. *See Brewer*, 72 F.3d at 334 (finding that the district court properly refused to draw an adverse inference where the destruction or failure to produce could have been due to reasons unrelated to the lawsuit); *Sarmiento v. Montclair State Univ.*, 513 F. Supp. 2d 72, 94 (D.N.J. 2007) (finding, in part, that the destruction of committee meeting notes to preserve the confidentiality of the deliberative process did not warrant an adverse inference).

### B. *Mammaro* and the Qualified Immunity Defense

The Court next turns to the Third Circuit precedent addressing due process claims and the qualified immunity defense in cases involving child services workers. As a preliminary matter, the Court acknowledges its previous opinion addressing Defendants' motion to dismiss, where it found "the facts of this case to be more analogous to *Croft* than to *Miller* [*v. City of Philadelphia*, 174 F.3d 368 (3d Cir. 1999)]" and Defendants were not entitled to qualified immunity at that time. *See* Op. 5–6, Sept. 10, 2015, ECF No. 51. The Court made that determination assuming the truth of Plaintiff's allegations. Accordingly, it reserved judgment on the merits of Defendants' qualified immunity defense until it had the benefit of a developed record at the end of discovery. *See id.* at 6, 6 n.1.

"Qualified immunity protects government officials from insubstantial claims in order to 'shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Mammaro*, 814 F.3d at 168 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "'When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)) (internal quotation and citation omitted). "To overcome qualified immunity, a plaintiff must plead facts 'showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Id.* at 168–69 (quoting *al-Kidd*, 563 U.S. at 735) (internal quotation omitted).

Since the issuance of this Court's previous opinion, the Third Circuit has further expounded on the qualified immunity defense as applied to cases involving child services workers. In *Mammaro*, the Circuit Court considered whether a parent's substantive due process right was violated when a child was temporarily removed from the plaintiff's custody after she violated the restrictions of her contact by removing the child from supervised housing. *See Mammaro*, 814 F.3d at 169–70. The plaintiff relied on *Croft* in submitting that her clearly established right was the "right to be free from temporary removal of her child unless there [was] 'some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.'" *See id.* at 169 (quoting *Croft*, 103 F.3d at 1126). The Court took issue with that definition, determining that it was too broad and that courts "must frame clearly established law 'in light of the specific context of the case, not as a broad general proposition.'" *See id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001)). It further clarified, "[F]or [plaintiff's] case to have legs she must show that the law was so well established at that time a reasonable caseworker would have understood that temporarily removing a child in those circumstances would violate substantive due process." *See id.* at 170.

The Court concluded "that there was no consensus of authority that temporarily removing a child after the parent takes the child from approved housing violates substantive due process." *See id.* It noted that the Supreme Court "has never found a substantive due process violation when state agencies temporarily remove a child, whatever the

circumstances of the removal" and, therefore, no such precedent clearly established the plaintiff's substantive due process right. *See id*. It further found that *Croft* was factually off point because the defendants' decision to remove was based on more than a six-fold hearsay report from an anonymous informant. The *Croft* holding, therefore, "did not put the caseworkers on notice that their conduct violated substantive due process." *See id* at 170–71. Finally, the Court explained:

> Caseworkers investigating allegations of child abuse often must make difficult decisions based on imperfect information. Particularly when deciding whether to separate parent and child, a caseworker must weigh the rights of the parent against the rights of the child and the risk of abuse. We are not the first to note that the failure to act quickly and decisively in these situations may have devastating consequences for vulnerable children. . . . This is why caseworkers are protected by qualified immunity unless clearly established law puts them on notice that their conduct is a violation of the Constitution. In this case, there was no such clearly established law, and qualified immunity covers the Division's caseworkers.

*Id*. at 171 (citations omitted). With this holding at the forefront, the Court turns to the merits of Plaintiff's claims.

### C. Plaintiff's Substantive Due Process Claim

Like the plaintiff in *Mammaro*, Plaintiff relies heavily on *Croft* in defining his substantive due process right. *See* Pl.'s Br. at 28–29 ("Wherefore, *Croft* warrants granting summary judgment in favor of [Plaintiff]."). Plaintiff submits that "[t]he constitutional deprivation is in the baseless implementation of the Safety Protection Plan." *Id*. at 28. He further suggests, "Similar to *Croft*, the focus here is whether the information available to the Defendants at the time would have created an objectively reasonable suspicion of abuse justifying the degree of interference with [Plaintiff's] rights as [Y.Y.'s] parent." *Id*. at 27–28. The Court agrees with Plaintiff that *Mammaro* does not override *Croft*. *See* Pl.'s Opp'n at 26–29. As detailed above, however, *Mammaro* commands a narrower definition of Plaintiff's clearly established right. *See* 814 F.3d at 169.

In *Croft*, the degree of interference in question was the removal of a parent from his child's home and further restriction of all contact based solely on the uncorroborated, six-fold hearsay, anonymous report of abuse. *See* 103 F.3d at 1125–27. The degree of interference at issue in the instant case is quite different. Importantly, Y.Y. was never removed from his home or Mother's custody. Furthermore, Plaintiff was never removed from the home; instead, the only restriction imposed on Plaintiff was the temporary requirement of supervised contact with Y.Y. pending the outcome of Y.Y.'s forensic psychosocial and medical evaluation. *See* Invest. Summ. at 7; Zeron Dep. 63:11–65:3.

Unlike *Croft*, Defendants' decision here was not solely based on a six-fold hearsay report. To the contrary, Roberts corroborated the report when she interviewed Mayer,

9

Y.Y.'s teacher, who heard his statements firsthand and subsequently made the call to DCPP from Aufiero's office. Invest. Summ. at 3; Aufiero Dep. 46:17–22.; Roberts Dep. 85:19–86:11, 324:17–24. Roberts obtained further corroboration when she visited Y.Y.'s apartment and confirmed that he shared a bedroom with Plaintiff, Mother and Boyfriend. Roberts Dep. 129:12–130:10. Roberts interviewed Y.Y., who had trouble identifying the private parts of his body. Invest. Summ. at 3; Roberts Dep. 100:3–23. Y.Y.'s Asperger's condition also created uncertainty in the substance of his communications with Roberts during that interview. Roberts Dep. 239:16–240:25, 322:7–323:17; Pl.'s Dep. 259:23–269:23. The totality of these circumstances informed Defendants' decision to seek a forensic examination of Y.Y. and to impose the temporary restriction of supervised contact. Roberts Dep. 395:15–397:3.

Thus, in the context of the specific facts of the case at bar, the Court concludes that the proper inquiry is whether Plaintiff had a clearly established substantive due process right to be free from the imposition of supervised contact with his child. As the Third Circuit noted in *Mammaro*, "no Supreme Court precedent clearly establishes that [a child's] temporary removal from [a parent's] custody violated substantive due process." 814 F.3d at 170. Likewise, no such precedent clearly establishes that Plaintiff's right was violated here. Furthermore, *Croft*, *Miller*, and *Mammaro* all concern the removal of a parent or child, not supervised contact. In fact, the Court has not found a single Third Circuit case addressing a similar factual context to the one at issue here. Consequently, no consensus of persuasive authority exists that Plaintiff's right was violated.

The Court, therefore, finds that Plaintiff did not have a clearly established right to be free from the imposition of supervised contact based on the facts presented here. Neither *Croft* nor any other case put Defendants on notice that their actions were impermissible. As such, Defendants are entitled to qualified immunity on Plaintiff's substantive due process claim. Accordingly, Plaintiff's motion is **DENIED** and Defendants' motion is **GRANTED** with respect to Plaintiff's substantive due process claim.

### D. Plaintiff's Procedural Due Process Claim

Plaintiff's right to a post-deprivation hearing, on the other hand, is clearly established. "[W]hen a parent complains of state action intruding on the 'parent-child relationship,' the parent's interest must 'be balanced against the state's interest in protecting children suspected of being abused.'" *B.S. v. Somerset Cnty.*, 704 F.3d 250, 271 (3d Cir. 2013) (quoting *Miller*, 174 F.3d at 373). "While the question of what constitutes due process is necessarily rooted in the circumstances of a given case, it is axiomatic that at least some process is required when a 'state seeks to alter, terminate, or suspend a parent's right to the custody of [her] minor children.'" *Id.* (quoting *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003)).

It is undisputed that Plaintiff consented to the implementation of the Safety Plan. Pl.'s Stmt., Ex. I, ECF No. 109-11; Invest. Summ. at 7; Pl.'s Dep. 92:21–25. It is further undisputed that no post-deprivation hearing occurred. *See* Pl.'s Stmt. ¶¶ 33–37; Defs'

Statement of Material Facts ¶ 32, ECF No. 111-3. Plaintiff argues that Roberts coerced his consent through her statements that he would be removed from the apartment and Y.Y. would be placed in foster care if he did not sign the Safety Plan. Pl.'s Dep. 107:12–115:11. Roberts admits that she did not give a copy of the DCPP Parents' Handbook to Plaintiff or Mother at the time of the Safety Plan's implementation and that she did not inform them of their right to consult with a lawyer.[7] Roberts Dep. 131:15–19, 155:23–156:2, 394:21–395:4. Roberts stated that Plaintiff, Mother and Boyfriend were cooperative, calm and respectful during her conversations with them and that no one voiced any objections to signing the Safety Plan. *Id*. 279:23–281:3, 337:15–17. She did not recall whether she told them that Plaintiff or Y.Y. would be removed if they did not sign the Safety Plan. *Id*. 347:9–348:8. Plaintiff admits that his interaction with Roberts was not confrontational in any way but still characterizes her statements as "threats." Pl.'s Dep. 110:8–11, 180:19–187:5.

The critical question is whether Plaintiff knowingly and voluntarily waived his right to a post-deprivation hearing by consenting to the Safety Plan and maintaining his consent while it was in place. The Court finds that there are multiple unresolved genuine disputes as to material facts, which renders the question unanswerable at summary judgment. Given the parties' competing version of events, it remains unclear exactly what was said during the implementation of the Safety Plan and it is for a jury to decide whose version is more credible. Furthermore, it remains unclear whether Plaintiff voiced any objections to the Safety Plan once he retained counsel. The Court assumes that competent counsel would have informed Plaintiff of his right to a hearing and yet the correspondence from counsel in the record does not make any such request. *See* Pl.'s Stmt., Ex. P.

For their part, Defendants insist that Y.Y.'s case was referred to the Attorney General, but the only corroborating evidence in the record is one sentence drafted by Roberts on a contact sheet indicating that the conference occurred on February 15, 2013. *See id*., Ex. W, ECF No. 109-25. Defendants did not provide an affidavit or any other statement from the Deputy Attorney General with whom they purportedly conferenced Y.Y.'s case. Pursuant to DCPP policy at that time, Defendants were supposed to conference with the Deputy within 10 days of implementation, but the contact sheet indicates that the conference did not occur until 15 days thereafter. *See id*.; Lennon Dep. 73:9–25, 78:3–79:4. Importantly, it is the Deputy's responsibility to commence court action when necessary. *See* Lennon Dep. 78:3–79:4; Certification of A. Costello, Ex. G 4–5, ECF No. 111-7. Thus, whether such conference ever occurred is critical to understanding whether Plaintiff's procedural due process rights were violated. Also, there is no evidence of correspondence between Plaintiff's counsel and the Attorney General's office. Any such correspondence, should it exist, is equally important to understanding what process Plaintiff received and whether he waived his right to a hearing.

---

[7] The Handbook explains that a parent has the right to "[a]ccept or refuse services which are not court ordered" and the right to consult with a lawyer at the parent's own expense. *See* Pl.'s Stmt., Ex. J 8, ECF No. 109-12.

In light of these discrepancies, the Court cannot conclude at this time whether Defendants violated Plaintiff's right to a post-deprivation hearing or whether he knowingly and voluntarily waived that right. The Court finds that there are outstanding genuine disputes as to material facts that must be resolved at trial. Accordingly, Plaintiff's and Defendants' motions are **DENIED** with respect to Plaintiff's procedural due process claim.

## IV.     CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is **DENIED**. Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiff's substantive due process claim. Defendants' motion is **DENIED** with respect to Plaintiff's procedural due process claim. An appropriate order follows.

*/s/ William J. Martini*
**WILLIAM J. MARTINI, U.S.D.J.**